O

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

KATHRYN A. PULIDO,

               Plaintiff,

           vs.

CAROLYN W. COLVIN, Acting
Commissioner of Social
Security,

              Defendant.

) Case No. EDCV 13-0370-JPR
)
)
)
) MEMORANDUM OPINION AND ORDER
) AFFIRMING COMMISSIONER
)
)
)
)
)
)

## I.   PROCEEDINGS

Plaintiff seeks review of the Commissioner's final decision denying her application for disability insurance benefits ("DIB").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c). This matter is before the Court on the parties' Joint Stipulation, filed November 18, 2013, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed and this action is dismissed.

## II.   BACKGROUND

Plaintiff was born on July 27, 1960.  (Administrative Record ("AR") 44.)  She completed ninth grade and previously worked in a sedentary position as a nursing staffer.  (AR 45-46.)

On March 17, 2010, Plaintiff filed an application for DIB. (See AR 133-35.)  She alleged that she had been unable to work since January 1, 2002, because of pain in her shoulders, neck, foot, and back.  (AR 159.)  After her application was denied initially and upon reconsideration, she requested a hearing before an ALJ.  (See AR 81-82.)  A hearing was held on October 12, 2011, at which Plaintiff, who was represented by counsel, appeared and testified, as did a vocational expert ("VE") and medical expert Dr. Joseph E. Jensen.  (AR 40-62.)  In a written decision issued November 1, 2011, the ALJ determined that Plaintiff was not disabled.  (AR 21-31.)  On January 23, 2013, the Appeals Council denied her request for review.  (AR 1-6.) This action followed.

## III. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. Id.; Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla

but less than a preponderance.  <u>Lingenfelter</u>, 504 F.3d at 1035 (citing <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir. 1996).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner.  <u>Id.</u> at 720-21.

## IV.   THE EVALUATION OF DISABILITY

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

### A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.  § 404.1520(a)(4)(I).  If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether

3

the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied.   § 404.1520(a)(4)(ii).   If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. § 404.1520(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform her past work; if so, the claimant is not disabled and the claim must be denied.   § 404.1520(a)(4)(iv).   The claimant has the burden of proving that she is unable to perform past relevant work.   Drouin, 966 F.2d at 1257.   If the claimant meets that burden, a prima facie case of disability is established.   Id.   If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy. § 404.1520(a)(4)(v).   That determination comprises the fifth and

---

[1]     RFC is what a claimant can do despite existing exertional and nonexertional limitations.   § 404.1545; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

final step in the sequential analysis.  § 404.1520; <u>Lester</u>, 81
F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

B.    <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in
any substantial gainful activity from the alleged onset date,
January 1, 2002, through the last insured date, March 31, 2007.
(AR 26; <u>see</u> AR 155.)  At step two, he concluded that Plaintiff
had severe impairments of cervical and lumbar degenerative disc
disease.  (<u>Id.</u>)  He determined that her mood disorder was not
severe, a finding she does not challenge.  (AR 26-27.)  At step
three, the ALJ determined that Plaintiff's impairments did not
meet or equal a Listing.  (AR 27.)  At step four, he found that
she retained the RFC to perform a range of "light work" with some
additional limitations.  (AR 31.)  Based upon the VE's testimony,
the ALJ determined that Plaintiff could still perform her past
work as a nursing staffer and was therefore not disabled.  (AR
31.)

V.    **RELEVANT FACTS**

A.    <u>Medical Records</u>

1.    *Dr. Goldman*

Plaintiff was seen by orthopedic surgeon Dr. Scott Goldman
from June 16, 2003, through February 12, 2010.  A June 25, 2003
MRI of Plaintiff's lumbar spine showed "[m]ild" disc dessication
and two small disc bulges but was otherwise normal.  (AR 264-65.)
On July 14, 2003, Dr. Goldman noted the MRI and recommended

physical therapy, Vioxx,[2] and a follow-up visit in four weeks,
which he anticipated would be her last.  (AR 391.)

On December 24, 2003, Dr. Goldman noted tenderness and
spasm, reduced range of motion, and severe pain with motion in
Plaintiff's lower lumbar region.  (AR 390.)  She was positive for
bilateral straight-leg tests but was neurologically intact, and
her x-rays were "unremarkable."  (Id.)  Dr. Goldman assessed
lumbar strain but ordered an MRI to rule out a herniated disc.
(Id.)  He prescribed Medrol,[3] Percocet,[4] a Toradol injection,[5]
lumbar support, and physical therapy and recommended a return
visit in four weeks.  (Id.)  A January 14, 2004 MRI of
Plaintiff's lumbar spine showed mild progression of degenerative
disc disease.  (AR 262-63.)  On January 21, 2004, Plaintiff still

---

[2]    Vioxx is the brand name for rofecoxib, an
antiinflammatory that has since been withdrawn from the market.
See Rofecoxib for osteoarthritis, PubMed Health, http://www.
ncbi.nlm.nih.gov/pubmedhealth/PMH0013260/ (last updated Nov. 16,
2004).

[3]    Medrol is the brand name for methylprednisolone, a
corticosteroid taken orally to relieve inflamation and treat
arthritis.  See Methylprednisolone oral, MedlinePlus,
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682795.html
(last updated Sept. 1, 2010).

[4]    Percocet is a brand name for a prescription painkiller
containing acetaminophen and oxycodone.  See Oxycodone,
MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/
meds/a682795.html (Sept. 15, 2013).  Oxycodone is a narcotic or
opioid used for short-term relief of severe back pain.  See
Taking narcotics for back pain, MedlinePlus, http://www.nlm.
nih.gov/medlineplus/ency/patientinstructions/000413.htm (last
updated Oct. 21, 2011).

[5]    Toradol is the brand name for ketorolac, a nonsteroidal
antiinflammatory used to treat moderately severe pain.  See
Ketorolac, MedlinePlus, http://www.nlm.nih.gov/medlineplus/
druginfo/meds/a693001.html (last updated Oct. 1, 2010).

1   demonstrated tenderness and spasm in her lower lumbar region.
2   (AR 389.)   An MRI showed a four-millimeter disc protrusion.
3   (Id.)   Dr. Goldman recommended a cortisone injection,[6] a Toradol
4   injection, Percocet, Celebrex,[7] and physical therapy and a repeat
5   visit in four weeks.   (Id.)   On March 12, 2004, Plaintiff had
6   recovered full range of motion and demonstrated only minimal
7   tenderness.   (AR 388.)

8        On September 2, 2004, x-rays of Plaintiff's left knee and
9   ankle were unremarkable.   (AR 387.)   Dr. Goldman ordered an MRI
10  of her knee to detect a possible meniscal tear, prescribed an
11  ankle brace, ice, Celebrex, and Vicodin,[8] and recommended a
12  follow-up visit in 10 days.   (Id.)

13       On December 5, 2005, after more than a year without an
14  appointment, Plaintiff demonstrated tenderness, spasm, and
15  reduced range of motion in her lumbar spine.   (AR 386.)   Her

16  _____

17       [6]     Corticosteroid injections provide pain relief by
     minimizing the body's reaction to inflammation.   See Cortisone
18   Injections, Am. Orthopaedic Soc'y for Sports Med. Sports Tips
     (2008), available at: http://www.sportsmed.org/uploadedFiles/
19   Content/Patient/Sports_Tips/ST%20Cortisone%20Injections%2008.pdf

20       [7]     Celebrex is the brand name for celecoxib, a
21   nonsteroidal antiinflammatory used to relieve pain, tenderness,
     swelling, and stiffness caused by arthritis and spondylitis.   See
22   Celecoxib, http://www.nlm.nih.gov/medlineplus/druginfo/meds/
23   a699022.html (last updated Aug. 15, 2012).

24       [8]     Vicodin is a brand name for a prescription painkiller
     containing acetaminophen and hydrocodone.   See Hydrocodone,
25   MedlinePlus, http://www.nlm.nih.gov/medlineplus/
     druginfo/meds/a601006.html (last updated May 15, 2013).   Like
26   oxycodone, hydrocodone is a narcotic or opioid used for short-
     term relief of severe back pain.   See Taking narcotics for back
27   pain, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/
28   patientinstructions/000413.htm (last updated Oct. 21, 2011).

1   lower extremities were neurologically intact.  (Id.)  Dr. Goldman
2   recommended a Toradol injection, Percocet, Medrol, and physical
3   therapy.  (Id.)  On January 4, 2006, Plaintiff still exhibited
4   tenderness, spasm, and reduced motion in her lumbar region.  (AR
5   385.)  Dr. Goldman recommended Percocet, Celebrex, physical
6   therapy, and a "recheck" in four weeks, which he anticipated
7   would be Plaintiff's last visit for that complaint.  (Id.)  On
8   February 1, 2006, Plaintiff had regained full range of motion,
9   with "minimal tenderness" and some spasm.  (AR 384.)  Dr. Goldman
10  recommended a home exercise program and a repeat visit "as
11  needed."  (Id.)

12       On March 30, 2007, more than a year since her last visit and
13  one day before the date last insured, Plaintiff reported pain in
14  her neck, upper back, and lower back.  (AR 383.)  Dr. Goldman
15  noted her description of injuries sustained in a 1989 car
16  accident.  (Id.)  He noted Plaintiff's full range of motion but
17  also "significant pain in flexion and extension," tenderness, and
18  spasm.  (Id.)  Plaintiff was neurologically intact except for
19  diminished sensation bilaterally in her fourth and fifth toes.
20  (Id.)  Dr. Goldman ordered MRIs of her spine and electromyogram
21  ("EMG") and nerve-conduction-velocity ("NCV") studies of her

22
23
24
25
26
27
28

8

extremities,[9] prescribed Medrol, Celebrex, Dilaudid,[10] and physical therapy, and recommended a follow-up visit in four weeks.  (Id.)

On May 18, 2007, Plaintiff continued to exhibit pain with range of motion, spasm, and tenderness but no neurological deficit.  (AR 382.)  An April 2, 2007 MRI of Plaintiff's thoracic spine revealed a "mild" vertebral deformity, "mildly accentuated" kyphosis,[11] "small" Schmorl's nodes,[12] a "very mild" disc bulge, and normal spinal signal intensity and girth.  (AR 253-54.)  An MRI of her cervical spine the same day showed a "very mild" disc bulge with no evidence of neural impingement; it was otherwise

---

[9]     EMG and NCV studies are specialized nerve tests designed to diagnose any abnormality in the functioning of spinal nerves.  See Specialized Nerve Tests: EMG, NCV and SSEP, N. Am. Spine Soc'y, http://www.knowyourback.org/Pages/Treatments/AssessmentTools/SpecializedNerveTests.aspx (last updated June 16, 2011).

[10]     Dilaudid is a brand name for hydromorphone, an opioid painkiller.  See Hydromorphone, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682013.html (last updated Aug. 15, 2013).

[11]     Kyphosis is a curving of the spine that leads to a hunchback or slouching posture.  See Kyphosis, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/001240.htm (last updated Sept. 4, 2012).

[12]     A Schmorl's node results from herniation of intervertebral disc tissue into the vertebral body.  See G. Saluja et al., Schmorl's nodes (intravertebral herniations of inervertebral disc tissue) in two historic British populations, J. Anat. 87, 87 (Apr. 1986), available at: http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1166495/pdf/janat00188-0089.pdf. Schmorl's nodes are generally asymptomatic.  See Ji Su Jang et al., Rami Communicans Nerve Block for the Treatment of Symptomatic Schmorl's Nodes - A Case Report, Korean J. Pain 262, 262 (Dec. 2010), available at: http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3000624/pdf/kjpain-23-262.pdf.

1    normal.   (AR 255-56.)   An MRI of her lumbar spine showed two

2    "mild" disc bulges.   (AR 257-58.)   Dr. Goldman recommended

3    Celebrex, Dilaudid, physical therapy, pain management with Dr.

4    James Rho, and a follow-up visit in four weeks.   (AR 382.)

5        On October 16, 2007, Plaintiff was seen by Dr. Goldman for

6    left-hand pain.   (AR 381.)   An x-ray showed sclerosing of the

7    scaphoid bone[13] and a possible fracture.   (Id.)   Dr. Goldman

8    requested an MRI, prescribed a splint and pain medication, and

9    recommended a return visit after the MRI.   (Id.)   On November 6,

10   2007, Dr. Goldman reported that the MRI revealed no fracture.

11   (AR 380; see AR 416-17.)   Plaintiff reported continued pain but

12   no numbness.   (AR 380.)   Dr. Goldman recommended continued use of

13   the splint and prescribed Medrol and Percocet.   (Id.)   Plaintiff

14   declined cortisone injections.   (Id.)

15       On January 25, 2008, Plaintiff saw Dr. Goldman for

16   complaints of low-back pain radiating into her right extremity.

17   (AR 379.)   He noted reduced range of motion, tenderness, and

18   spasm in her lower lumbar spine.   (Id.)   X-rays revealed some

19   disc-space narrowing in her lumbar spine but were normal as to

20   Plaintiff's right hip.   (Id.)   Dr. Goldman recommended an MRI,

21

22

23

24   _____

25       [13]   Sclerosis, or induration, is a hardening of tissue, see
     Stedman's Medical Dictionary 893, 1604 (27th ed. 2000); in the
26   case of bone tissue, it is also known as osteocondensation.   The
     scaphoid bone is one of eight bones that comprise the wrist.   See
27   Scaphoid Fractures, Am. Soc'y for Surgery of the Hand,
     http://www.assh.org/Public/HandConditions/Pages/ScaphoidFractures
28   .aspx (last visited Mar. 17, 2014).

                                    10

1    EMG/NCV studies of her lower extremities, Percocet, Motrin,[14]
2    Medrol, and a follow-up visit in four weeks.  (Id.)  On February
3    27, 2008, Dr. Goldman noted that the MRI scans showed lumbar disc
4    protrusions but a normal hip.  (AR 378; see AR 412-14.)  He
5    recommended physical therapy with Intervertebral Differential
6    Dynamics ("IDD") Therapy,[15] Medrol, Motrin, Percocet, and a
7    follow-up visit in four weeks.  (AR 378.)  On April 28, 2008,
8    Plaintiff continued to complain of lower back pain radiating into
9    her right extremity.  (AR 377.)  Dr. Goldman recommended adding
10   cortisone injections to her treatment.  (Id.)  He anticipated
11   that her follow-up in four weeks would be her last visit.  (Id.)
12        On May 19, 2008, Dr. Goldman treated Plaintiff for right-
13   wrist pain.  (AR 376.)  Although x-rays were unremarkable, he
14   ordered further views.  (Id.)  On July 2, 2008, he noted that
15   further x-rays were unremarkable.  (AR 375.)  He ordered an MRI
16   of Plaintiff's wrist and, because of tenderness and spasm in her
17   lower back, another of her lumbar spine.  (Id.)  On July 14,
18   2008, Plaintiff still complained of pain in her right wrist,
19   lumbar spine, and right hip.  (AR 374.)  Dr. Goldman noted that
20   the MRI of her wrist was unremarkable and the MRI of her spine
21   revealed a small disc bulge and annular tear.  (Id.; see AR 404-
22
23
24        [14]    Motrin is a brand name for the nonsteroidal
25   antiinflammatory ibuprofen.  See Ibuprofen, MedlinePlus,
     http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682159.html
26   (last updated Oct. 1, 2010).
27        [15]    IDD therapy treats lower back pain through manipulation
28   of the spine.  See FAQ, IDD Therapy, http://iddtherapy.com/
     ENGLISH/FAQ.html (last visited Mar. 7, 2014).

                                  11

1  07.)  He recommended physical therapy, Oxycontin,[16] Celebrex,

2  cortisone injections, and a follow-up visit in four weeks.  (AR

3  374.)

4       On August 13, 2008, Plaintiff complained of head, neck,

5  chest, and back pain.  (AR 373.)  Dr. Goldman noted tenderness

6  and spasm in her cervical spine and upper back and pain radiating

7  into the left side of her head.  (Id.)  He noted that "Plaintiff

8  will present to the ER for evaluation of severe headache and

9  back/chest pain."  (Id.)  Plaintiff returned to Dr. Goldman on

10 August 27, 2008, with upper- and lower-back pain.  (AR 372.)  He

11 noted spinal tenderness, ordered a CT scan of her abdomen and

12 chest, recommended continued physical therapy, and prescribed

13 Oxycontin and Celebrex.  (Id.)

14      On September 26, 2008, Plaintiff visited Dr. Goldman with

15 complaints of pain in her right hip and lower back.  (AR 371.)

16 Dr. Goldman assessed disc bulges, right-side sciatica, and hip

17 bursitis.  (AR 371.)

18      On January 22, 2009, Plaintiff was seen by Dr. Goldman for

19 reevaluation.  (AR 370.)  She reported that "her pain medication

20 and home exercise program have relieved her pain" but that she

21 had occasional back pain that "leaves her bedridden."  (Id.)  Dr.

22 Goldman noted full cervical range of motion with discomfort at

23 the extremities and some spinal tenderness and spasm.  (Id.)

24 Plaintiff's lumbar range of motion has decreased, and she had

25 tenderness and spasm around her lumbar spine.  (Id.)  Dr. Goldman

26 recommended Oxycontin and Motrin and a return visit in three

27 ─────────────────────────

28      [16]    Oxycontin is a brand name for oxycodone.  See supra
   n.5.

12

1  months.   (Id.)

2      On April 23, 2009, Plaintiff reported that she was "doing
3  well" with home exercise and pain medication.   (AR 369.)   She had
4  full cervical range of motion with pain at the extremes, spasm,
5  and tenderness.   (Id.)   She had reduced lumbar range of motion
6  with pain, tenderness, and spasm.   (Id.)   Dr. Goldman again
7  recommended continued medication with Oxycontin and Motrin and a
8  return visit in three months.   (Id.)

9      On August 12, 2009, an x-ray showed a plantar heel spur.
10  (AR 368, 399.)   Dr. Goldman diagnosed Plaintiff with plantar
11  fasciitis or a plantar tear and prescribed a CAM boot[17] and
12  crutches, Oxycontin, Motrin, and an MRI.   (AR 368.)   The MRI was
13  unremarkable.   (AR 367.)   Plaintiff reported on September 2,
14  2009, that she was "feeling much better."   (Id.)

15      On November 3, 2009, Plaintiff was seen for reevaluation and
16  complained of pain in both shoulders.   (AR 366.)   Dr. Goldman
17  noted pain with range of motion and weakness of the rotator cuff
18  in both shoulders.   (Id.)   X-rays were unremarkable.   (Id.)   Dr.
19  Goldman ordered an arthrogram[18] of the right shoulder and MRI of
20  the left.   (Id.)   Plaintiff was given Norco[19] and Oxycontin.
21  (Id.)   Both studies revealed degenerative changes.   (AR 365.)

---

22

23  [17]    A CAM Walker Boot is a removable, inflatable cast.   See
24  http://orthotape.com/cam_walkers.asp (last visited Mar. 7, 2014).

25  [18]    An arthrogram is an x-ray.   See Joint x-ray,
26  MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/
003810.htm (last updated Apr. 14, 2013).

27  [19]    Norco is the brand name for a painkiller combining
28  hydrocodone and acetamiophen.   See Hydrocodone, MedlinePlus,
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html
(last updated May 15, 2013).

13

1  Plaintiff's left shoulder also showed either a partial tendon
2  tear or tendinitis.  (Id.)  Dr. Goldman recommended physical
3  therapy.  (Id.)

4       A November 11, 2009 MRI of Plaintiff's left shoulder found
5  degenerative change, bursitis, and either a tendon tear or
6  tendinosis.  (AR 393-94.)  An MRI of her right shoulder the same
7  day showed a partial tendon tear, tendinosis, and bursitis.  (AR
8  395-96.)

9       On December 2, 2009, Plaintiff continued to complain of pain
10  in her shoulders and demonstrate painful range of motion and
11  rotator-cuff weakness.  (AR 364.)  Dr. Goldman recommended
12  cortisone injections and continued physical therapy.  (Id.)  On
13  December 29, 2009, Plaintiff's bilateral range of motion was
14  nearly full but her rotator cuffs remained weak.  (AR 363.)  She
15  was positive for Neer and Hawkins signs.[20]  (Id.)  Dr. Goldman
16  recommended home exercise because "patient does not believe
17  physical therapy is helping" and continued pain medication.
18  (Id.)  He discussed surgical options.  (Id.)

19            2.   *Physical Therapy*

20       The record reflects Dr. Goldman's prescription of thrice-
21  weekly physical therapy at various times from 2003 to 2009 to
22  relieve pain, increase range of motion, promote healing, and
23  improve function in Plaintiff's back.  (See, e.g., AR 269-71,
24

25       [20]    Neer's and Hawkins-Kennedy impingement tests are used
26  to diagnose impingements and tears in the rotator cuff.  See
    Physical Therapist's Guide to Rotator Cuff Tear, Am. Physical
27  Therapy Ass'n, http://www.moveforwardpt.com/
    symptomsconditionsdetail.aspx?cid=95bd746b-b25f-46f5-8373-fb56c9f
28  6b46a#.Uxo2Pz9dVc0 (last visited Mar. 7, 2014).

273-78.)   On December 30, 2005, a therapist reported improvement in Plaintiff's function but no other change.   (AR 272.)   A May 14, 2007 report noted improvement in pain, range of motion, strength, and function.   (AR 618.)   An April 15, 2008 report noted improvement in pain, range of motion, strength, swelling, and function.   (AR 616.)

### 3.   Dr. Martinez

Between August 19 and October 2, 2009, Plaintiff was seen by Charles Martinez, D.O.,[21] for her back impairment.   He noted evidence of disc bulges, annular tears, and fibromyalgia and Plaintiff's complaints of pain and depression.   (See AR 282, 285, 288-89.)   He recommended increased physical activity, physical and aquatic therapy, a decreased dose of Oxycontin, Lyrica,[22] and continued psychiatric treatment.   (AR 282, 285, 288-89, 295.)

### 4.   Dr. Hou

On July 27, September 18, and November 20, 2009, Plaintiff was seen by rheumatologist Dr. Anthony Hou, whose diagnoses

---

[21]   A doctor of osteopathic medicine (D.O.), like a medical doctor, completes four years of medical school, can practice any specialty, and is a licensed physician.   See Doctor of Osteopathic Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/002020.htm (last updated Feb. 26, 2014). Osteopathy adheres to the principle that a patient's history of illness and physical trauma are written into the body's structure.   Id.   Osteopathic physicians therefore complete additional training in the study of "hands-on manual medicine" and the body's musculoskeletal system to permit them to "feel the patient's 'living anatomy' (the flow of fluids, motion and texture of tissues, and structural makeup)."   Id.

[22]   Lyrica is the brand name for pregabalin, used to relieve neuropathic pain and treat fibromyalgia.   See Pregabalin, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605045.html (last updated Sept. 1, 2009).

include joint pain, inflammatory polyarthropathy,[23] rheumatism,
osteoarthritis, back pain, bursitis, and fibromyalgia.  (AR 324,
327, 341.)  August 28, 2009 x-rays of Plaintiff's wrists, hands,
and knees showed mild to moderate joint-space narrowing in her
medial right knee but were otherwise normal.  (AR 345-56.)  Dr.
Hou recommended a fibromyalgia management program, prescribed
Celebrex and Cymbalta,[24] and suggested unspecified injections,
stretching exercises, and stress management.  (AR 325, 328, 339,
341-42.)

     5.   Dr. Rho

     From November 19, 2009, through April 21, 2011, Plaintiff
was seen by pain-management specialist Dr. James Rho.  His
November 19, 2009 examination revealed reduced range of motion in
Plaintiff's cervical and lumbar spine but no evidence of weakness
or sensory deficit.  (AR 357.)  Plaintiff had no trigger points
or tenderness in her soft tissue, was negative for straight-leg
raises, was able to perform heel-and-toe walking and one-leg
standing, had a normal gait, and had worn "high heels" to the
exam.  (Id.)  Dr. Rho assessed severe neck pain with symptoms of

---

[23]   Arthopathy is joint disease.  See Stedman's, supra, at
150.

[24]   Cymbalta is the brand name for duloxetine, which is
used to treat depression and generalized anxiety disorder.  See
Duloxetine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/
druginfo/meds/a604030.html (last updated Feb. 15, 2013).

16

spondylosis;[25] severe low-back pain without radiculopathy[26] but with symptoms of spondylosis; severe myofascial pain and spasm; and fibromyalgia.  (AR 358.)  He prescribed modified doses of Oxycontin, oxycodone, Celebrex, and Cymbalta, recommended that Plaintiff consider steroid-injection therapy, and suggested continued physical activity.  (Id.)

On December 15, 2009, Plaintiff complained of left-foot pain and reported that physical therapy was not helping her shoulder problems.  (AR 702.)  Dr. Rho's assessment remained the same. (AR 703.)  He modified the dosage of Plaintiff's prescriptions, which were reported to include Frova,[27] and recommended regular home exercise or physical therapy.  (AR 704.)  On January 21, 2010, Plaintiff reported that her medications were helping with pain and "help her function and take care of the house."  (AR 699.)  She reported that resting helped with lower-back pain and that she was not interested in injection therapy because of "the short nature of the relief and that it's 'not a cure.'"  (Id.) Dr. Rho noted that Plaintiff sat comfortably during the exam. (AR 700.)  He adhered to his previous assessments and recommendations.  (AR 700-01.)

On February 18, 2010, Plaintiff complained of a nausea-

---

[25]    Spondylosis refers generally to degeneration of the vertebrae.  See Stedman's, supra, at 1678.

[26]    Radiculopathy is disease of the spinal cord.  See Stedman's, supra, at 1503.

[27]    Frova is the brand name for frovatriptan, which is used to treat migraine headaches.  See Frovatriptan, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604013.html (last updated Sept. 1, 2010).

inducing headache (AR 696) and had difficulty sitting because of
her low-back pain (AR 697).  Dr. Rho's assessment remained the
same.  (AR 697-98.)  He substituted Relpax[28] for Frova because of
its cost (AR 696, 698) but otherwise continued Plaintiff's
previously prescribed medications and continued to recommend home
exercise or physical therapy.  (AR 698.)

On March 18, 2010, Plaintiff reported a recent fall, after
which she stayed in bed for two days because of the pain, though
her medications helped.  (AR 652.)  Dr. Rho noted that she had
"mostly" thoracic and left-hip pain but also pain in both
shoulders.  (AR 653.)  He recommended continuation of her
previously prescribed medications and home exercise or physical
therapy.  (AR 654.)  On April 22, 2010, Plaintiff reported no
significant changes since her previous visit.  (AR 349.)  Dr. Rho
noted mostly thoracic-spine and left-hip pain and possible
fibromyalgia, but "it's more spine related pain likely."  (AR
650.)  He recommended continuation of her previously prescribed
medications in modified doses and home exercise or physical
therapy.  (AR 651.)

On June 10, 2010, Plaintiff reported a "small decrease in
pain" and that she was doing well enough on medications that she
did not want spinal injections.  (AR 613.)  Dr. Rho noted her
continued pain, particularly in her thoracic spine and left hip.

---

[28]   Relpax is a brand name for eletriptan, which is used to
treat migraine headaches.  See Eletriptan, MedlinePlus,
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603029.html
(last updated Sept. 1, 2010).

1   (AR 614.)  He discontinued Relpax, prescribed Sumavel,[29]

2   continued modified doses of Plaintiff's previously prescribed

3   medications, and recommended home exercise or physical therapy

4   and injections, which Plaintiff refused.  (AR 615.)  On August

5   31, 2010, Dr. Rho noted "mostly" thoracic-spine pain and right-

6   leg weakness and a mild sensory difference between her right and

7   left extremities.  (AR 643.)  In addition to Plaintiff's

8   previously prescribed medications, prescriptions included

9   Lexapro.[30]  (AR 344.)

10       On October 26, 2010, Plaintiff reported that her "new

11  Oxycontin is not as effective and takes longer . . . to work" and

12  that she was taking more oxycodone as a result.  (AR 683.)  She

13  also complained of a strain in her right arm but had refused Dr.

14  Goldman's recommendation of a cast and did not wear a sling.

15  (Id.)  Dr. Rho added prescriptions for Ambien[31] and Zanaflex.[32]

16

17  _____

18      [29]     Sumavel is a brand name for sumatriptan, which is used
    to treat migraine headaches.  See Sumatriptan injection,
19  MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/
    meds/a696023.html (last updated Sept. 1, 2010).
20
        [30]     Lexapro is a brand name for escitalopram, which is used
21  to treat depression and generalized anxiety disorder.  See
    Escitalopram, MedlinePlus, http://www.nlm.nih.gov/
22  medlineplus/druginfo/meds/a603005.html (last updated Apr. 13,
    2012).
23
24      [31]     Ambien is a brand name for zolpidem, which is used to
    treat insomnia.  See Zolpidem, http://www.nlm.nih.gov/
25  medlineplus/druginfo/meds/a693025.html (last updated Sept. 15,
    2013).
26
27      [32]     Zanaflex is a brand name for tizanidine, a muscle
    relaxant.  See Tizanidine, MedlinePlus, http://www.nlm.nih.gov/
28  medlineplus/druginfo/meds/a601121.html (last updated Feb. 11,
    2012).

1  (AR 685.)

2      On January 31, 2011, Plaintiff reported that she continued

3  with prescribed medications, which helped her pain, but her

4  lower-back pain was worse.  (AR 762.)  Dr. Rho discontinued

5  Lexapro, Ambien, and Zanaflex, adjusted the dosages of her

6  remaining prescriptions, suggested methadone,[33] and urged her to

7  consider interventional therapy, such as injections, "as it is

8  necessary and appropriate, but patient not interested."  (AR

9  764.)  He continued to recommend home exercise or physical

10 therapy.  (Id.)  On March 10, 2011, Dr. Rho noted "no significant

11 changes" since Plaintiff's previous visit (AR 757) and adhered to

12 his prior recommendations (AR 758).  On April 21, 2011, Plaintiff

13 reported a fall on her right side, for which she did not seek

14 medical attention, and numbness and tingling in her right arm and

15 hand but no weakness.  (AR 754.)  She said her medications were

16 "maintaining her pain at a tolerable level."  (Id.)  Dr. Rho

17 added Lunesta[34] and Zanaflex to her existing prescriptions.  (AR

18 756.)

19          6.   *Bledsoe Foot & Ankle Clinic*

20      From March 6, 2009, to August 8, 2010, Plaintiff was treated

21 at Bledsoe Foot & Ankle Clinic for problems with heel pain and

---

23  [33]     Methadone is used to relieve moderate to severe pain
that has not been relieved by nonnarcotic pain relievers and to
24  prevent withdrawal symptoms in patients who are addicted to
opiates.  See Methadone, MedlinePlus, http://www.nlm.nih.gov/
25  medlineplus/druginfo/meds/a682134.html (last updated Feb. 1,
2009).
26

27  [34]     Lunesta is the brand name for eszopiclone, which is
used to treat insomnia.  See Eszopiclone, MedlinePlus,
28  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605009.html
(last updated Oct. 1, 2008).

plantar fascitis.  (See AR 629-33.)  Treatments included an
aircast (AR 630), ice (AR 632), and Motrin (id.).

       7.  *Inland Psychiatric*

    From May 10, 2007, to September 13, 2011, Plaintiff was
treated at Inland Psychiatric Group.  The record reflects
diagnoses of posttraumatic stress disorder (AR 513; see AR 511,
667 (noting parental deaths)) and major depressive disorder (AR
668); complaints of depression, anxiety, sleep issues, low
energy, and poor concentration (AR 511; but see AR 678); moderate
impairments in relationships and health but none with respect to
work or school (AR 513); and prescriptions for Cymbalta (AR 498,
675), Effexor[35] (AR 509, 669, 672), and Xanax (AR 509).
Plaintiff does not challenge the ALJ's finding that the medical
evidence did not establish the existence of a severe mental-
health impairment during the relevant period.

       8.  *Physician Assessments for DIB*

    In a February 12, 2010 letter, Dr. Goldman noted diagnoses
of bilateral shoulder-impingement syndrome, left-foot plantar
fascia tear, cervical-spine disc herniation, thoracic-spine disc
herniation, and lumbar-spine disc herniation with radiculopathy.
(AR 362.)  He opined that Plaintiff's "multiple painful
conditions will not allow her to return to any type of work."
(Id.)

    On September 13, 2011, Dr. Visit Chatsuthiphan, a treating

---

[35]   Effexor is a brand name for venlafaxine, which is used
to treat depression.  See Venlafaxine, MedlinePlus,
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694020.html
(last updated Jan. 15, 2012).

physician, completed a Mental Impairment Questionnaire, in which he diagnosed Plaintiff as bipolar.[36]   (AR 787.)  He opined that she had poor or no ability to do most activities required of unskilled or skilled workers but provided no clinical findings to support his assessment.  (AR 790-91.)  He opined that Plaintiff had marked restrictions of daily living, difficulties in social function, and episodes of decompensation and would often suffer deficiencies of concentration, persistence, or pace.  (AR 791.) He dated her limitations to August 2010.  (AR 792.)

On January 25, 2012, pain-management specialist Dr. Gregory Suelzle[37] completed a Physical Residual Function Capacity Questionnaire, noting diagnoses of cervical spondylosis "adequately controlled with medications," lumbar spondylosis, bilateral shoulder pain, and spine enthesopathy.[38]  (AR 820.)  He deemed Plaintiff's prognosis "poor."  (Id.)  He opined that her pain and symptoms were constantly severe enough to interfere with concentration (AR 821) and that she was severely limited in her ability to cope with work stress (AR 822).  He opined that she could not walk a city block without rest; could continuously sit or stand for only 15 minutes; would need to walk for three minutes every 15 minutes; and would need unscheduled 40-minute

---

[36]   Bipolar disorder is a mental illness characterized by wide mood swings.  See Bipolar Disorder, MedlinePlus, http://www.nlm.nih.gov/medlineplus/bipolardisorder.html (last updated Oct. 24, 2013).

[37]   Dr. Suelzle appears to be Dr. Rho's colleague.  (See AR 824.)

[38]   Enthesopathy refers to disease occurring at the insertion of muscle tendons and ligaments into bones or joint capsules.  See Stedman's, supra, at 600.

1   breaks every 15 minutes during an eight-hour workday.  (Id.)  He
2   opined that Plaintiff's legs should be elevated 50 percent of the
3   time when sitting and that she required a cane and walker for
4   occasional standing and walking.  (AR 823.)  He stated that
5   Plaintiff could occasionally lift less than 10 pounds, could not
6   bend or twist at the waist, and could work with her hands and
7   fingers only 25 percent of the time and with her arms only three
8   percent of the time.  (Id.)  He expected that Plaintiff would be
9   absent from work more than three times a month.  (AR 824.)  He
10  dated her symptoms to July 1989.  (Id.)

11          B.   Written Submission

12          On June 30, 2010, Plaintiff's husband completed a Function
13  Report on her behalf, reporting that he did most domestic chores,
14  reminded her to take medication, and helped her with her care,
15  which took longer because of her pain.  (AR 196-97.)  Plaintiff
16  was able to prepare "easy meals" daily and fold laundry, do light
17  dusting, sweep, water plants, and wash dishes twice a week.  (AR
18  197.)  She was limited in house and yardwork by her inability to
19  stand, reach, lift, and bend because of pain in her arms, back,
20  legs, and neck.  (AR 198.)  Plaintiff went out in a car alone
21  five times a week and shopped twice a month.  (Id.)  Her spouse
22  managed their finances.  (Id.)

23          Plaintiff read, watched TV, and refinished furniture daily
24  and collected antiques once a month.  (AR 199.)  She socialized
25  over the phone and in person daily, over lunch once a month, and
26  on family visits every two months.  (Id.)  She also went monthly
27  to medical appointments, two or three times monthly to the
28  pharmacy, and weekly to the grocery store.  (Id.)

Plaintiff reported that her impairments affected her ability to lift, stand, walk, sit, climb stairs, kneel, squat, reach, use her hands, see, bend, remember, concentrate, and complete tasks. (AR 200.)  She stated that she was able to walk for seven to 10 minutes before resting for two to three, could pay attention for less than 10 minutes, and struggled to follow instructions. (Id.)  She had used a cane, crutches, and a splint since 2009 and glasses daily since 2007.  (AR 201.)

C.   Assessments of State Medical Consultants

On July 15, 2010, Ronald Crow, D.O., completed a Physical Residual Capacity Assessment, in which he opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; stand or walk for six hours in an eight-hour day; sit for six hours in an eight-hour day; and do unlimited pushing and pulling.  (AR 620.)  He found no other limitations.  (AR 621-23.)

On November 29, 2010, psychiatrist Dr. M. Salid completed a Psychiatric Review Technique, noting insufficient evidence of a medically determinable impairment.  (AR 710.)  His Case Analysis includes a note from Dr. Paulette Harar affirming a prior determination that Plaintiff retained the RFC to do light work. (AR 724.)

D.   Hearing Testimony

At the time of the hearing, Plaintiff was 51 years old.  (AR 45.)  She testified that she last worked in 2002 as a staffer for a nursing facility, a sedentary position that she was able to perform despite a back injury sustained in a 1989 car accident. (AR 45-47.)  She testified that in 2002 the pain throughout her back had become "too intense" and prevented her from working.

(AR 46-48.)  Plaintiff stated that the pain continued through her last insured date, was a "10" on a scale of one to 10, and was not relieved by prescription medication.  (AR 48.)  Plaintiff testified that in 2007 she could sit for only 10 to 15 minutes, walk about 500 feet, and carry about six pounds.  (AR 49.)  None of her doctors had recommended surgery.  (AR 48.)  She began physical therapy in 2003.  (AR 55.)

She testified that she had suffered depression since childhood, it was treated by various doctors during the relevant period, and she suffered bouts of crying daily at that time.  (AR 50-51.)  Plaintiff stated that her depression had worsened since 2007, she still cried daily, and she continued to receive treatment, including prescription medication.  (Id.)

Plaintiff testified to only "minimal" difficulty putting on shoes and shirts and some difficulty with bathing.  (AR 51.)  She stated that she was licensed and able to drive without difficulty.  (AR 51-52.)  She did dishes, light cooking, and dusting, but her husband and children managed other chores.  (AR 52.)  When she and her husband went out to eat, Plaintiff had difficulty sitting.  (AR 53.)  Plaintiff testified to difficulty gripping items with her right hand.  (Id.)  She testified that her prescription medications caused dizziness, lightheadedness, forgetfulness, difficulty concentrating, itching, sweating, and rashes.  (AR 54.)

Dr. Jensen, an orthopedic surgeon, appeared as a medical expert and testified that Plaintiff's medical records contained evidence of both cervical and lumbar degenerative disc disease, including "mild chronic changes" in April 2007 and "some

1  degenerative changes" in April 2002 and June 2003.  (AR 55-56.)
2  He found no evidence of radiculopathy.  (AR 56.)  Dr. Jensen
3  noted that medical records postdating the date on which Plaintiff
4  was last insured reflected epidural procedures to relieve pain,
5  rheumatology evaluations indicating fibromyalgia, and some
6  evidence of degenerative joint disease in her left wrist.  (Id.)
7       Dr. Jensen testified that Plaintiff's impairments did not
8  meet a Listing.  (Id.)  He opined that Plaintiff could lift and
9  carry 20 pounds occasionally and 10 pounds frequently; could
10 stand or walk for a combined six hours in an eight-hour day;
11 could sit for six hours in an eight-hour day; could occasionally
12 use stairs or ramps, stoop, crouch, kneel, or crawl; could not
13 walk on uneven terrain; could not use ladders, ropes, or
14 scaffolding; could frequently use her upper extremities for gross
15 and fine manipulation but could not use her left wrist for
16 forceful grasping or torquing; and could not reach above the
17 shoulder with either arm.  (AR 56-57.)  Upon cross-examination,
18 Dr. Jensen stated that he saw no evidence of noncompliance or
19 malingering.  (AR 58.)
20      A VE testified, based on a hypothetical "younger
21 individual"[39] with Plaintiff's education and work history and the
22 RFC outlined by Dr. Jensen, that Plaintiff would be able to
23 return to her prior work as a nursing staffer.  (AR 60-61.)  He
24 testified that no jobs would be available to such a person if she

25

26

27      [39]  On March 31, 2007, when Plaintiff's eligibility for DIB
   expired, she would have been 46.  A person under the age of 50 is
28 deemed a "younger person," one whose age will not "seriously
   affect your ability to adjust to other work."  § 404.1563(c).

26

were "off task" 20 percent of the time because of depression or pain.  (AR 61.)

    E.   ALJ's Decision

    In his November 2, 2011 decision, the ALJ found that Plaintiff had severe impairments of cervical and lumbar degenerative disc disease.  (AR 26.)  He found that although Plaintiff alleged a severe affective mood disorder, she had failed to prove its severity during the period in which she was insured.  (AR 26-27.)

    The ALJ determined that Plaintiff retained the RFC to perform "a range of light work"[40] with some additional limitations: "she is unable to climb ladders, scaffolds, or ropes; she cannot walk on uneven terrain; she can frequently perform gross and fine manipulation bilaterally; she cannot perform forceful handling or grasping with her left upper extremity; and she cannot reach overhead bilaterally."  (AR 27.)

    Although the ALJ found that Plaintiff "reasonably had pain during the relevant period due to her cervical and lumbar condition," he found that the medical record reflected only "routine, conservative treatment" for "mild to moderate pain" and thus did not support Plaintiff's claim of disabling symptoms. (AR 29; see also AR 30.)   The ALJ also found that the alleged

---

    [40]   "Light work" involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  § 404.1567(b).  "Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  Id.  "To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities."  Id.

1  side effects from Plaintiff's pain medications were mild and
2  would not preclude work activities.  (AR 30.)  The ALJ noted that
3  during the relevant period no treating physician had limited
4  Plaintiff's functioning to a level that precluded performing work
5  activities.  (AR 29; see also AR 30.)  He noted that Dr. Jensen
6  and the state-agency physicians who reviewed Plaintiff's file
7  agreed that she was not disabled and found that their opinions
8  were consistent with the medical evidence.  (AR 30.)  The ALJ
9  therefore found that although Plaintiff's impairments could
10 reasonably be expected to cause the alleged symptoms, her
11 statements concerning the intensity, persistence, and limiting
12 effects of her symptoms were not credible to the extent they were
13 inconsistent with the conservative treatment rendered.  (Id.)
14 **VI.  DISCUSSION**

15      Plaintiff alleges that the ALJ failed to properly consider
16 her testimony regarding her pain and limitations.[36]  (J. Stip. at
17 4.)

18      A.  Applicable Law

19      An ALJ's assessment of pain severity and claimant
20 credibility is entitled to "great weight."  See Weetman v.
21 Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779
22 F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to
23 believe every allegation of disabling pain, or else disability
24 benefits would be available for the asking, a result plainly
25 contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina v. Astrue, 674

---

27      [36]      Plaintiff stipulates that the ALJ "fairly and
28 accurately summarized the medical and non-medical evidence of
record" other than as specifically challenged in the Joint
Stipulation.  (J. Stip. at 3.)

1  F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks
2  omitted).

3      In evaluating a claimant's subjective symptom testimony, the
4  ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d
5  at 1035-36.  "First, the ALJ must determine whether the claimant
6  has presented objective medical evidence of an underlying
7  impairment [that] could reasonably be expected to produce the
8  pain or other symptoms alleged."  Id. at 1036 (internal quotation
9  marks omitted).  If such objective medical evidence exists, the
10  ALJ may not reject a claimant's testimony "simply because there
11  is no showing that the impairment can reasonably produce the
12  degree of symptom alleged."  Smolen v. Chater, 80 F.3d 1273, 1290
13  (9th Cir. 1996) (emphasis in original).  When the ALJ finds a
14  claimant's subjective complaints not credible, the ALJ must make
15  specific findings that support the conclusion.  See Berry v.
16  Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).

17      Absent affirmative evidence of malingering, those findings
18  must provide "clear and convincing" reasons for rejecting the
19  claimant's testimony.  Lester, 81 F.3d at 834.  If the ALJ's
20  credibility finding is supported by substantial evidence in the
21  record, the reviewing court "may not engage in second-guessing."
22  Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002).

23      B.    Analysis

24      Although Plaintiff contends that the ALJ "never states which
25  testimony is not credible and what evidence undermines that
26  specific testimony" (J. Stip. at 9 (citing Reddick, 157 F.3d at
27  722)), the ALJ explicitly outlined his "primary reasons for
28  discounting the claimant's allegations of disability,"

1  summarizing the evidence in the record that conflicted with her
2  testimony.   (AR 29-30.)

3      Plaintiff, however, contends that the medical evidence
4  supported her testimony, noting the results of her MRIs (J. Stip.
5  at 7 (citing AR 254, 255-56, 258, 261, 264-65)), the findings of
6  and treatments prescribed by Dr. Goldman, Plaintiff's treating
7  physician during the relevant period (J. Stip. at 7-8 (citing AR
8  382-88)), and her physical-therapy records (J. Stip. at 8 (citing
9  AR 267-70)).   As the ALJ noted, although Plaintiff's MRIs
10  indicated some evidence of degenerative disc disease, the reports
11  consistently reflected "mild" impairments.   (AR 29; see, e.g., AR
12  254 (noting "mild anterior wedge deformity," "small,
13  subcentimeter Schmorl's nodes," "very mild, 1.5 mm posterior disc
14  bulge," and "normal signal intensity and girth" in the thoracic
15  spinal cord); AR 256 (finding "very mild 1.5 to 2.0 mm posterior
16  disc bulge . . . without evidence of neural impingement" and
17  noting cervical spine otherwise appeared normal); AR 258 (noting
18  "mild 1.5 to 2.0 mm disc bulge . . . without evidence of neural
19  impingement," "mild degenerative disc disease," and "annular tear
20  formation"); AR 264-65 (finding "2.0 mm concentric disc bulge,"
21  "1.0-2.0 mm annular bulg[e]," and no evidence of stenosis).)
22  Consistent with these findings, Dr. Goldman's records reflect
23  conservative treatment with prescription medication, physical
24  therapy, and follow-up visits as needed.   Indeed, Dr. Goldman
25  repeatedly anticipated that Plaintiff would need no further
26  treatment for a given ailment, and the medical evidence
27  demonstrates yearlong or greater gaps in treatment, suggesting
28  that she had in fact improved.   (See, e.g., AR 384, 387, 388.)

Moreover, as the ALJ noted,[37] the reports from Plaintiff's physical-therapy sessions - recommended by both Dr. Goldman and pain-management specialist Dr. Rho - reflect improvement in pain, range of motion, strength, and function. (See AR 272, 616, 618.) Thus, none of this evidence establishes a disabling condition.

Recognizing the ALJ's finding that her treatment was conservative and routine (J. Stip. at 10 (citing AR 30)), Plaintiff asserts that there was no evidence anything more could have been done to alleviate her symptoms. Plaintiff misses the point. It was her burden to show not just significant but disabling impairments. See Drouin, 966 F.2d at 1257. She could not do so with symptom testimony alone but rather bore the burden of setting forth diagnostic and clinical findings of a disabling impairment. 20 C.F.R. § 404.1529(a); Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). Because Plaintiff's medical providers deemed her impairments mild enough to merit only conservative treatment, the ALJ properly relied on their determinations in discrediting Plaintiff's allegations of disabling pain. Hurter v. Astrue, 465 F. App'x 648, 650 (9th Cir. 2012) ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." (alteration in original) (citing Parra, 481 F.3d at 751)).

Moreover, the ALJ properly considered the effectiveness of Plaintiff's medication, physical therapy, and other treatments in

---

[37] Although Plaintiff asserts that the ALJ "never offered . . . as a reason" that Plaintiff had shown improvement (J. Stip. at 19), the ALJ explicitly noted that "[t]he claimant's treatment was merely conservative and her condition improved." (See AR 30.)

1  evaluating the severity and limiting effects of her impairments.

2  20 C.F.R. § 404.1529(c)(3)(iv)-(v).  During the relevant period,

3  Plaintiff was treated primarily with physical therapy or home

4  exercise and pain medication, which were reported to be

5  effective.  (See, e.g., AR 272, 384, 616, 618.)  Although she

6  appears to have received a few steroid injections from Dr.

7  Goldman during the relevant period (see AR 386, 389, 390), she

8  more recently rejected even these slightly invasive treatments

9  (see AR 368, 380, 613, 615, 700, 764) and reported that she was

10  able to manage her pain and other symptoms with medication and

11  home exercise (AR 369, 370, 613, 699, 704, 754).[38]  "Impairments

12  that can be controlled effectively with medication are not

13  disabling for the purpose of determining eligibility for [Social

---

[38]    Although some courts have held that injections do not
constitute conservative treatment, those cases involved claimants
whose pain was treated (generally ineffectively) with a series of
regular injections and more invasive procedures - not just a few
injections over the course of years.  See, e.g., Christie v.
Astrue, CV 10-3448-PJW, 2011 WL 4368189, at *4 (C.D. Cal. Sept.
16, 2011) (noting pain treatments included "steroid injections,
trigger point injections, epidural shots, and cervical
traction"); Samaniego v. Astrue, EDCV 11-865 JC, 2012 WL 254030,
at *4 (C.D. Cal. Jan. 27, 2012) (noting treatment "on a
continuing basis" with steroid and anesthetic "trigger point
injections" and occasional epidural injections); Huerta v.
Astrue, EDCV 07-1617-RC, 2009 WL 2241797, at *4 (C.D. Cal. July
22, 2009) (noting that neck pain was treated by surgery and "a
series of epidural steroid injections into [claimant's] cervical
spine").  Even if the ALJ erred in deeming steroid injections
conservative, the remainder of his credibility findings were
supported by substantial evidence in the record, so remand is not
required.  Carmickle v. Comm'r Soc. Sec. Admin., 533 F.3d 1155,
1162-63 (9th Cir. 2008).

32

1  Security] benefits."  Warre v. Comm'r Soc. Sec. Admin., 439 F.3d

2  1001, 1006 (9th Cir. 2006).[39]

3      Plaintiff asserts that the ALJ incorrectly deemed the side

4  effects of her medications to be "mild" (AR 30), noting her

5  testimony that her medications caused dizziness, lightheadedness,

6  itching, sweating, rashes, and concentration problems (J. Stip.

7  at 10; see also AR 192 (husband noting Plaintiff's side effects

8  from medications)).  Plaintiff contends that the "ALJ cites no

9  evidence that contradicts [her] statements" regarding side

10  effects and therefore failed to provide a "clear and convincing

11  reason" for rejecting her testimony.  (J. Stip. at 11 (citing

12  Smolen, 80 F.3d at 1283-84).)  In fact, the ALJ did not reject

13  Plaintiff's statements but rather relied on them in determining

14  that her medications caused side effects that were merely mild.

15  As the ALJ noted (AR 28), Plaintiff attributed her lack of

16  employment and limited daily activities to pain and discomfort

17  (AR 46-48, 198), not the side effects of her medications.

18  Indeed, despite her allegations of dizziness and lightheadedness,

19

20      [39]  Plaintiff misconstrues the statements of the ALJ and
the Commissioner as asserting that her "testimony can only be
21  deemed credible if she required hospitalizations and surgery."
(J. Stip. at 19.)  Rather, as the ALJ explicitly noted,
22  Plaintiff's testimony was credited to the extent it was
consistent with the evidence in the record.  (AR 30.)  Because
23  the statute requires a showing of disabling impairments –
impairments so severe as to prevent Plaintiff from engaging in
24  any substantial gainful activity, 42 U.S.C. § 423(d)(1)(A) –
evidence of surgery or hospitalization is properly considered in
25  assessing an alleged impairment.  See, e.g., 20 C.F.R. pt. 404,
subpt. P, app. 1 § 1.03 (including in Listing of Impairments to
26  musculoskeletal system "[r]econstructive surgery . . . of a major
weight-bearing joint . . . and return to effective ambulation did
27  not occur, or is not expected to occur, . . . within 12 months of
onset").
28

33

1  Plaintiff stated that she was able to drive and do errands alone
2  (AR 51-52, 198), and despite alleged concentration problems,
3  Plaintiff stated that she was able to read and refinish furniture
4  daily (AR 199). Moreover, although her medical records reflect
5  medications discontinued because of side effects or lack of
6  effect (see, e.g., AR 643, 684 (noting failed medications), 683
7  (noting Plaintiff stopped taking sleep medication that caused
8  headaches)), they do not reflect Plaintiff's complaints of the
9  side effects alleged in her testimony and written submission;
10  indeed, Dr. Rho consistently noted Plaintiff's denial of
11  dizziness (see, e.g., AR 684, 688, 700). The ALJ reasonably
12  considered such inconsistencies in assessing Plaintiff's
13  credibility. See Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th
14  Cir. 2008) (holding that ALJ may consider many factors in
15  weighing claimant's credibility, including "ordinary techniques
16  of credibility evaluation, such as . . . prior inconsistent
17  statements concerning the symptoms . . . and the claimant's daily
18  activities").

19      Although Plaintiff challenges the ALJ's finding that no
20  treating or examining physician opined during the relevant period
21  that Plaintiff was disabled or had greater limitations than those
22  in the RFC (J. Stip. at 11), that finding is indisputably
23  accurate. The ALJ's focus on medical opinions predating the May
24  2007 termination of Plaintiff's eligibility for DIB was not, as
25  Plaintiff contends, "a red herring" but rather mandated by
26  governing law, which provides that "an individual cannot receive
27  disability benefits for a recurrence of a disability . . . unless
28  the individual can establish that the current period of

34

1  disability began on or prior to the expiration of insured
2  status."  Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453,
3  1457 (9th Cir. 1995); see also 42 U.S.C. § 423.  Dr.
4  Chatsuthiphan dated Plaintiff's mental impairment to August 2010,
5  well after her eligibility for DIB expired.  (AR 792.)[40]
6  Although Dr. Suelzle dated his dire assessment of Plaintiff to
7  1989 (AR 824), the date of her car accident (AR 47, 383), it is
8  undisputed that she worked full time from 1989 to 2002 (AR 47,
9  161), and Dr. Rho, Dr. Suelzle's colleague, did not see Plaintiff
10  as a patient until November 2009 (AR 357).  See Johnson v.
11  Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995) (holding that ALJ
12  properly discounted physician's opinion when it was conclusory
13  and unsubstantiated by relevant medical documentation).  Dr.
14  Goldman's February 12, 2010 opinion that Plaintiff's condition
15  "will not allow her to return to any kind of work" (AR 362) was
16  inconsistent with his own treatment of Plaintiff and the other
17  evidence of record, see id. at 1432-33; Andrews v. Shalala, 53
18  F.3d 1035, 1041 (9th Cir. 1995) (solely province of ALJ to
19  resolve conflicts in properly supported medical opinion
20  evidence)); more importantly, it does not establish that
21
22

---

23  [40]    To the extent Plaintiff contends that the ALJ did not
    rely on a lack of evidence of pre-2007 mental-health treatment in
24  assessing Plaintiff's credibility (J. Stip. at 18), the ALJ in
    fact correctly found that Plaintiff had failed to establish the
25  severity of her mental impairment before March 31, 2007 (AR 26-
    27).  The first instance of mental-health treatment in the record
26  occurred on May 10, 2007 (see AR 510-14), at which point
    Plaintiff's eligibility for benefits had terminated.  As the ALJ
27  noted, Plaintiff did not allege a mental impairment when she
    applied for disability benefits (see AR 159) and did not allege
28  depression until May 2010 (AR 205).

Plaintiff was disabled before March 31, 2007, three years earlier.

Although Plaintiff is correct that the opinions of the state-agency medical consultants were "based solely on the view of the objective evidence and did not account for [Plaintiff's] subjective symptoms" (J. Stip. at 12 (citing AR 624)), the ALJ properly accorded these opinions only "some weight" given that they were consistent with the other evidence of record (AR 30); see Thomas, 278 F.3d at 957 ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record."); 20 C.F.R. § 404.1527(c)(4) (ALJ will generally give more weight to opinions that are "more consistent . . . with the record as a whole").

On appellate review, this Court is limited to determining whether the ALJ properly identified clear and convincing reasons for discrediting Plaintiff's credibility.  Smolen, 80 F.3d at 1284.  The record reflects that he did so, supported by evidence that Plaintiff's degenerative disc disease was mild, her symptoms were controlled by medication and other conservative treatment, and none of her physicians deemed her disabled during the relevant period.  These are proper factors for evaluating credibility, the findings are sufficiently specific to show that the ALJ's credibility determination was not arbitrary, and the reasoning is clear and convincing.  Tommasetti, 533 F.3d at 1039-40; Houghton v. Comm'r Soc. Sec. Admin., 493 F. App'x 843, 845 (9th Cir. 2012).  Because the ALJ's findings are supported by substantial evidence, this Court may not engage in

1  second-guessing.  See Thomas, 278 F.3d at 959; Fair, 885 F.2d at

2  604.  In sum, the ALJ reasonably and properly discredited

3  Plaintiff's subjective testimony regarding the severity of her

4  symptoms as not being wholly credible.  Remand is not warranted.

5  **VII. CONCLUSION**

6       Consistent with the foregoing, and pursuant to sentence four

7  of 42 U.S.C. § 405(g),[41] IT IS ORDERED that judgment be entered

8  AFFIRMING the decision of the Commissioner and dismissing this

9  action with prejudice.  IT IS FURTHER ORDERED that the Clerk

10 serve copies of this Order and the Judgment on counsel for both

11 parties.

15 DATED: March 19, 2014         _____

16                                      JEAN ROSENBLUTH
                                        U.S. Magistrate Judge

---

26     [41]   This sentence provides: "The [district] court shall
27 have power to enter, upon the pleadings and transcript of the
   record, a judgment affirming, modifying, or reversing the
28 decision of the Commissioner of Social Security, with or without
   remanding the cause for a rehearing."

37